Lisa TROUT, Plaintiff,

v.

**KNOX COUNTY BOARD OF EDUCATION, Defendant.**

Mark Taylor, Plaintiff,

v.

**William Edward Haslam, et al., Defendants.**

Case No. 3:14–cv–49, Case No. 3:14–cv–113

United States District Court, E.D. Tennessee, at Knoxville.

Signed 02/17/2016

Richard L. Colbert, W.W. Frank Wilbert, Kay, Griffin, Enkema & Colbert, PLLC, Nashville, TN, for Plaintiffs.

David M. Sanders, Knoxville, TN, Jay C. Ballard, Kevin Steiling, Michael K. Markham, Office of the Attorney General, Nashville, TN, for Defendants.

## ORDER

HARRY S. MATTICE, JR., UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' Haslam, Huffman, and the State of Tennessee's ("the State Defendants") Motion to Dismiss (Doc. 49), and Defendant Knox County Board of Education's ("Defendant KCBE") Motion to Dismiss (Doc. 51). For

the reasons stated herein, Defendants' Motions will be **GRANTED**.

## I. BACKGROUND

Plaintiff Lisa Trout filed her Complaint (Doc. 1)[1] on February 6, 2014 against the Knox County Board of Education. Plaintiff Mark Taylor filed his Complaint (Doc. 1 in Case No. 3:14–cv–113) on March 19, 2014 against the Knox County Board of Education, and Governor William Haslam and State Commissioner of Education Kevin Huffman, in their official capacities. The cases were consolidated on February 11, 2015 (Doc. 21) due to the significant overlap in legal and factual disputes regarding the Tennessee Value–Added Assessment System ("TVAAS").[2] Its complexity and centrality to these suits warrant an in-depth discussion of TVAAS' methods and implications before the Court turns to Plaintiffs' individual claims.

### A. The TVAAS Statistical Method

In response to the federal government's Race to the Top competition for federal education funding, Tennessee passed the First to the Top Act ("the Act") in 2010. In relevant part, the Act mandates that teacher evaluations be factored into employment decisions, including promotion, retention, termination, compensation, and the attainment of tenure. Pursuant to the Act, the Tennessee State Board of Education adopted Policy 5.201, which required all schools to use teacher evaluations to inform "human capital decisions," but did not mandate the weight these evaluations were to be given. These decisions are to be made at the local level.

---

1. Unless otherwise noted, all Document references are to Case No. 3:14–cv–49.

2. TVAAS is statistical system intended to measure a teacher's efficacy in facilitating student learning. Such systems, known as value-added modeling, have become prevalent

in the high-stakes testing era of public education. *See, e.g.,* Preston C. Green III et al., *The Legal and Policy Implications of Value–Added Teacher Assessment Policies,* 2012 B.Y.U. EDUC. & L.J. 1, 2 (2012). The methodology and implications of TVAAS will be discussed at greater length, *infra.*

The Act and Policy 5.201 require that 35% of each teacher's evaluation be comprised of growth data represented by TVAAS scores.[3] Describing TVAAS, state law provides that

> [t]he statistical system will use available and appropriate data as input to account for differences in prior student attainment, such that the impact that the teacher, school and school district have on the educational progress of students may be estimated on a student attainment constant basis. The impact that a teacher, school or district has on the progress, or lack of progress, in educational advancement or learning of a student is referred to hereafter as the 'effect' of the teacher, school, or school district on the educational progress of students.

Tenn.Code Ann. § 49–1–603(a)(2). Furthermore, Policy 5.201 states, "[t]he primary purpose of annual teacher and principal evaluations is to identify and support instruction that will lead to high levels of student achievement." (Doc. 50 at 2).

The main data input for TVAAS results are student test scores on standardized tests administered in the Tennessee Comprehensive Assessment Program ("TCAP"). To be clear, TVAAS scores are not a direct measure of student achievement, but rather are a measure of year-over-year increases in standardized test scores used as a proxy to estimate teacher, school, and school district effect on student learning. TVAAS results are expressed as a "test statistic," which is a statistical method allowing one to accept or reject a "null hypothesis," by way of statistical estimate accompanied by a "standard error." In this case, the "null hypothesis" is that "the 'growth' in students' standardized test results is equal to the mean or State

growth standard." (Doc. 56 at 9). That is, TVAAS results are generated by comparing actual student performance on standardized tests to expected performance. In general, for a test statistic to be

> 'statistically significant,' it must be "at least two standard errors above or below the mean or growth standard in order to say, with a statistically significant level of confidence (95%), that the failure to meet the growth standard (a negative test statistic) or the exceeding of the growth standard (a positive test statistic) did not occur 'just by chance.'

(*Id.* at 9–10). A TVAAS test statistic of negative two (–2), or two standard errors below the growth standard, approximates with 95% confidence that a teachers' students grew at a below-average rate. A test statistic of negative one (–1), or one standard error below the growth standard, approximates with 68% confidence that a teachers' students grew at a below-average rate. Conversely, a test statistic of positive one (+1) and positive two (+2) approximate with 68% and 95% confidence, respectively, that a teachers' students grew at an above-average rate. The brunt of Plaintiffs' complaints about the TVAAS system amounts to a challenge of the State's use of 68% confidence levels, that is, a level "substantially less than a 'statistically significant' level," (*Id.* at 10), in making high-stakes employment decisions.

TVAAS test statistics are converted into a qualitative scale so that they may be factored into a teachers' overall evaluation. The conversions, with associated confidence levels, are as follows:

> 5 — "Most Effective." Test statistic = +2 = 95% confidence that a teacher's students performed at above-average student growth.
> 4 — "Above Average." Test statistic = +1 = 68% confidence that a teacher's

---

3. The remainder of a teacher's evaluation is comprised of 15% "other growth measures,"

and 50% traditional classroom observation. (Doc. 58 at 6).

students performed at above-average student growth.

3 — "Average Effectiveness."

2 — "Approaching Average Effectiveness." Test statistic = –1 = 68% confidence that a teacher's students performed at below-average student growth.

1 — "Least Effective." Test statistic = –2 = 95% confidence that a teacher's students performed at below-average student growth.

Therefore, Plaintiffs argue, the only TVAAS scores that are supported at a statistically significant level are 1 and 5. Furthermore, Plaintiffs claim, "[b]ecause relatively large standard errors accompany individual teacher TVAAS estimates, it is not uncommon for a statistically significant 95% confidence interval to span three or more TVAAS 'Levels.'" (*Id.* at 11). For example, a score of 3 could, with a reasonable confidence interval, actually span anywhere from 2 to 4.

Three final points about the TVAAS system merit consideration. First, the TVAAS system groups teachers into two categories. The first category is comprised of teachers who teach a subject tested by the TCAP assessments, and who have six or more full time equivalent students taking these assessments. This group of teachers receives individualized TVAAS scores based on their students' test results, and this individualized TVAAS score comprises 35% of the teachers' evaluations.[4] The second category of teachers is comprised of teachers who do not teach tested subjects, or who have fewer than six full time equivalent students taking TCAP

assessments. These teachers do not receive an individualized TVAAS score, but rather receive a system-wide TVAAS score based on the scores of all students at the teacher's school, even those the teacher did not teach, which comprises 25% of the teachers' evaluations.[5]

Second, the TVAAS model and teachers' individual scores are based on the most recent five years of testing history for all students. A teacher's individualized TVAAS score, therefore, is recalculated annually using the most recent five years of student test scores, and accordingly "may change in subsequent years based on a recalculated statistical analysis of different data." (Doc. 41 at 9). This re-estimation, Plaintiffs claim "can result in retroactive changes in a teacher's TVAAS estimate and consequent changes in the teacher's TVAAS 'Level' after 'human capital' decisions have been made on the basis of the teacher's prior TVAAS estimate. (Doc. 56 at 12).

Finally, the Act and Policy 5.201 require the State Board of Education to adopt a local level grievance procedure for teachers to challenge "the accuracy of the data used in the evaluation and the adherence to the evaluation policies." Tenn.Code Ann. § 49–1–302(d)(2)(A). Policy 5.201 defines "accuracy of the data" as limited to whether "the data identified with a particular teacher is correct." (Doc. 50 at 6). Furthermore, the Policy states that its purpose is to "efficiently and fairly resolve grievances regarding procedural errors in the evaluation process, not to address disputes regarding employment actions taken based on the results of an evaluation. More significant due process rights are

---

**4.** Teachers are only given an individual TVAAS score based on these tested students if the teacher is endorsed to teach the class that he/she taught. If the teacher is not endorsed to teach his/her classes, he/she receives a system-wide TVAAS score.

**5.** For these teachers, 60% of their evaluations are based on traditional classroom observation, as opposed to 50% for the first category of teachers. (Doc. 50 at 4).

provided pursuant to state law to teachers when actual employment actions are taken." (Doc. 41–1 at 8).[6]

## B. The APEX Bonus System

Beginning in the 2011–12 school year, Defendant KCBE implemented the APEX strategic compensation system. This system governs annual bonus compensation for teachers, awarding $2,000 for exemplary performance and $1,500 for model performance. A teacher's TVAAS score comprises 35% of his/her evaluation score for purposes of an APEX bonus. (Doc. 41 at 12–13). Therefore, Plaintiffs argue, TVAAS scores are a large factor in determining whether a teacher in Knox County receives a yearly bonus.

## C. The Individual Plaintiffs and their Claims

### 1. Plaintiff Lisa Trout

Plaintiff Lisa Trout ("Plaintiff Trout") has taught in the Knox County school system since 1992, and has been assigned to Richard Yoakley Alternative School since 2004. For many years, Plaintiff Trout taught Algebra I, a class she is endorsed to teach. In the Fall of 2010, however, Plaintiff Trout was reassigned to teach Algebra II, for which she did not carry an endorsement. On October 18, 2011, Plaintiff Trout received a letter from Defendant KCBE that "specified that for teachers [at Plaintiff Trout's school] the 35% growth measure would be based on system-wide TVAAS results, and the 15% "other achievement" measure would also be based on system-wide data." (Doc. 41 at 14).

In the fall of 2012 at her "Beginning of the Year Conference," Plaintiff Trout was informed that, based on her 2011–12 school year evaluation including system-wide TVAAS results, she had an overall evaluation score of 4, which entitled her to a $1,500 APEX bonus. Plaintiff Trout, however, never received her APEX bonus. After several months of inquiry, Plaintiff learned in April 2013 that instead of receiving a TVAAS score based on system-wide data for the 2011–12 school year, Plaintiff Trout received an individualized TVAAS score based on the test results of her Algebra II students.[7] Plaintiff Trout did not enter her students' scores into the system because she was under the impression that she would not receive an individualized TVAAS score. Instead, a counselor at Plaintiff Trout's school, without Plaintiff Trout's knowledge, entered her students' TCAP scores into the TVAAS system. (*Id.* at 15).

Based on these scores, Plaintiff Trout received an individualized TVAAS score of 1, which negatively impacted her evaluation score to such an extent that she no longer qualified for an APEX bonus. Furthermore, Plaintiff Trout was unable to challenge her evaluation under the procedure established by Policy 5.201 because by the time she learned that her students' test scores had been improperly entered by a counselor, her time to file a grievance had already passed.

Plaintiff Trout asserts several federal and state law claims against Defendant KCBE.[8] Specifically,

---

**6.** For an in-depth discussion of the history, changes, and implications of the Act and TVAAS, *see generally Wagner v. Haslam,* 112 F.Supp.3d 673, 677–88 (M.D.Tenn.2015).

**7.** These results, by state law, could only be used for a limited purpose because Plaintiff Trout was not at the time certified to teach Algebra II.

**8.** On March 2, 2015, the Court granted the State of Tennessee's Motion to Intervene as Defendant for the limited purpose of defending the constitutionality of the state laws and policies at issue. (Doc. 26).

Trout's Complaint includes claims that the use of TVAAS as an element of the Knox County schools' APEX bonus system is arbitrary and deprives her and other teachers of their property without substantive due process in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution; that the use of school-wide or district-wide TVAAS estimates for teachers in non-tested grades or subjects is arbitrary and irrational and violates the rights of teachers under the Due Process and Equal Protection Clauses of the Fourteenth Amendment;[9] that the assignment of an overall TVAAS 'effectiveness' result on the basis of test results of as few as six students, regardless of the total number of students taught, is arbitrary and irrational and violates the rights of teachers under the Equal Protection Clause of the Fourteenth Amendment; that the Knox County Board of Education deprived her of her property interest in an APEX bonus arbitrarily and without due process in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 8, of the Tennessee Constitution; and that the Knox County Board of Education breached its contract with her when it denied her an APEX bonus after she had earned it on the terms that had been established for her.

(Doc. 56 at 13–14).

### 2. Plaintiff Mark Taylor

Plaintiff Mark Taylor ("Plaintiff Taylor") is an eighth grade science teacher at Farragut Middle School. During the 2011–12 school year, Plaintiff Taylor taught one class in the "regular eighth-grade Science curriculum." (Doc. 47 in Case No. 3:14–cv–113 at 16). His other four classes were upper level Physical Science classes that were offered to advanced students for high school credit. Since the Physical Science curriculum was not aligned to the subject matter of the eighth-grade science TCAP assessment, Plaintiff Taylor's advanced students were not administered the TCAP assessment during the 2011–12 school year. Instead, Plaintiff Taylor's advanced students took a locally developed end-of-course exam, on which his students averaged a score of 91%. Because this locally developed exam was not a statewide assessment, the results were not used in the calculation of Plaintiff Taylor's individualized TVAAS score. Accordingly, Plaintiff Taylor's 2011–12 TVAAS score was based on the TCAP results of only 22 of his 142 students. These students' scores resulted in a TVAAS score of 1, or "Least Effective," which was used to calculate his overall evaluation score. Plaintiff Taylor alleges that this low TVAAS score resulted in the denial of an APEX bonus because "the observation component of his evaluation . . . showed that he was exceeding expectations." (Id. at 17). Plaintiff Taylor filed a grievance over his evaluation in accordance with the procedures mandated by state law and Policy 5.201. Defendant KCBE subsequently informed Plaintiff Taylor that his grievance lacked merit because "his concern 'does not meet the definition of a grievance' and that he therefore was not entitled to a grievance appeal hearing." (Id. at 18).

In December of 2012, Plaintiff Taylor received an email from the Science Supervisor at KCBE informing him that KCBE decided that for the 2012–13 school year, all of Plaintiff Taylor's students, including his Physical Science students, would take the Science TCAP test. During the 2012–13 school year, Plaintiff Taylor taught two classes of general science and three classes of advanced Physical Science. Notwith-

---

**9.** Plaintiff Trout has since abandoned these claims. (See Doc. 55).

standing his knowledge that his own evaluation would depend in part on his students' performance on the TCAP test, Plaintiff Taylor did not re-tailor his Physical Science curriculum to better prepare his students for the TCAP assessment. Instead, he continued to teach the advanced high school curriculum, with the implicit result that his most advanced students would not necessarily be well-prepared for the TCAP assessment. With all of his students tested on the 2012–13 TCAP assessment, Plaintiff Taylor again received a TVAAS score of 1, and was not entitled to receive an APEX bonus.

Plaintiff Taylor's parents happen to be personally acquainted with Dr. William Sanders, the developer of TVAAS. When asked whether a TVAAS score based on TCAP results of only a small fraction of a teacher's students was a proper use of TVAAS, Dr. Sanders responded "[f]or an overall evaluation of the effectiveness of the teacher to facilitate student academic progress, of course not." (*Id.* at 19). Accordingly, Plaintiff Taylor attacks the constitutionality of the state's use of TVAAS in evaluating its teachers. Specifically,

> Taylor's Complaint includes claims that the use of TVAAS in the Knox County schools' APEX bonus system and other employment decisions is arbitrary and irrational in violation of the Due Process Clause of the Fourteenth Amendment; that the use of TVAAS results based on TCAP testing of only a small fraction of his students or on TCAP testing of students for a course other than the course he taught them was arbitrary and deprived him of his property interest in an APEX bonus without due process in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 8, of the Tennessee Constitution; that he was denied an opportunity for a hearing in a meaningful manner on his grievance over denial of an APEX bonus in violation of his rights under the Due

Process Clause of the Fourteenth Amendment and Article I, Section 8, of the Tennessee Constitution; and that the classification and difference in treatment of teachers based on whether they have six or more students taking the TCAP test, regardless of the number of students taught, is arbitrary and irrational in violation of the Equal Protection Clause of the Fourteenth Amendment.

(Doc. 56 at 15).

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide, in relevant part, that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed.R.Civ.P. 8(a)(2). While Rule 8(a) does not require plaintiffs to set forth detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). At a minimum, Rule 8(a) requires the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"—that is, Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 555 n. 3, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is thus not a challenge to the plaintiff's factual allegations, but rather, a "test of the plaintiff's cause of action as stated in the complaint." *Flanory v. Bonn*, 604 F.3d 249, 252 (6th Cir. 2010).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937; *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955 (holding that a complaint is subject to dismissal where plaintiffs failed to "nudg[e] their claims across the line from conceivable to plausible"). Although the Court must take all of the factual allegations in the complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and a plaintiff's legal conclusions couched as factual allegations need not be accepted as true. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937; *see Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 722 (6th Cir.2010). Therefore, to survive a motion to dismiss under Rule 12(b)(6), plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

## III. ANALYSIS

### A. Deposition Transcripts and Adherence to Rule 12(b)(6)

As an initial matter, Plaintiffs chide Defendants for disregarding the standards of Rule 12, (*See* Doc. 56 at 2–5), concluding

that "Defendants' failure to adhere to Rule 12 standards should alone warrant denial of the Defendants' motions." (*Id.* at 5). The Court notes that in this misguided argument Plaintiffs have, ironically, submitted and referenced matters outside of the pleadings. (*See, e.g.,* Docs. 56 at 3, 57–1, 57–2). Because Plaintiffs' arguments about Defendants' characterizations of the TVAAS statistical system rely on matters outside the pleadings, namely the "extensive discovery ... regarding the statistical underpinnings of TVAAS" referenced in Plaintiffs' brief (Doc. 56 at 3), these arguments and attached depositions will not be considered in the instant Motions to Dismiss.[10] *See* Fed.R.Civ.P. 12(d).

### B. Substantive Due Process

Plaintiffs claim that individualized TVAAS results are too imprecise to serve as a valid measure of teacher efficacy. Accordingly, Plaintiffs argue, the use of TVAAS scores in making high-stakes employment decisions is arbitrary and irrational, and violates Plaintiffs' rights under the substantive portion of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Similarly, Plaintiffs argue that Defendants' use of individualized TVAAS scores for teachers with six or more full time equivalent student test takers, but system-wide scores for teachers with fewer than six full time equivalent student test takers, is arbitrary and irrational, also in violation of the substantive portion of the Due Process Clause.

#### 1. Protected Interest

■■■■ In order to bring a claim under the substantive portion of the Due Process

---

**10.** The Court also notes that for purposes of the instant Motions to Dismiss, the semantic difference between the statistical terms "confidence" and "certainty" is immaterial. Furthermore, the Court rejects Plaintiffs' argument that Defendants' use of one statistical term over another somehow impermissibly increases Plaintiffs' burden over that imposed by Fed.R.Civ.P. 12(b)(6).

Clause, a party must present a sufficiently important life, liberty, or property interest. *See Charles v. Baesler*, 910 F.2d 1349, 1352–53 (6th Cir.1990).

> The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Id.* at 1353 (internal quotation marks omitted). Here, Plaintiffs argue that the shortcomings of TVAAS described above arbitrarily deprive them of their property rights in receiving APEX bonuses, and may, more broadly, deprive them and others similarly situated of their property rights in continued employment. These property rights, however, are just the kind of state-created contract rights that the Baesler Court determined are not protected by the substantive Due Process Clause. *Id.* ("Most, if not all, state-created contract rights . . . are not protected by substantive due process.").

Two cases from the United States Court of Appeals for the Sixth Circuit are instructive. First, in *Ramsey v. Board of Education of Whitley County, Kentucky*, the Sixth Circuit held that a teacher's property interest in being paid for 113 sick leave days did not implicate the Due Process Clause. 844 F.2d 1268 (6th Cir.1988). Specifically, the Court held that

> an interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can and should be redressed by a state breach of contract action and not by a federal action under section 1983.

*Id.* at 1274–75. Similarly, in this situation, Plaintiffs argue that their property interest in APEX bonuses implicates the Due Process Clause. An APEX bonus, however, is simply a "pure benefit of employment," that is more properly addressed by a state breach of contract action. *Id.* at 1274 ("[A]n employee deprived of a property interest in a specific benefit, term, or condition of employment, suffers a loss which is defined easily . . . and therefore, any interference with that interest is redressed adequately in a state breach of contract action.").

Second, in *Sutton v. Cleveland Board of Education*, the Sixth Circuit went even further than the *Ramsey* Court in declaring that the "state-created right to tenured employment lacks substantive due process protection." 958 F.2d 1339, 1350 (6th Cir. 1992). Moreover, the Court held that "[a]bsent the infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process," and that state law remedies would adequately compensate plaintiffs for their losses. *Id.* at 1351. Thus, Sixth Circuit precedent clearly establishes that even termination from a tenured position does not implicate the substantive Due Process Clause. Accordingly, the denial of an APEX bonus, surely a deprivation of lesser magnitude than termination from tenured employment, cannot, as a matter of law, amount to a substantive due process violation.

Because Plaintiffs have failed to plead a sufficient property interest to trigger the protections of the substantive portion of the Due Process Clause, Defendants' Motions to Dismiss Plaintiffs' Substantive Due Process Claims will be **GRANTED**.

### 2. *Rational Basis Review*

Even if Plaintiffs had articulated a property interest sufficient to trigger the pro-

tections of the substantive portion of the Due Process Clause, their claims must fail.

■■■ The Due Process Clause protects "specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988). The legal standard for violations of the substantive portion of the Due Process Clause is substantially similar to that under the Equal Protection Clause of the Fourteenth Amendment. Accordingly, to state a claim under the Due Process Clause,

> a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class or burdened a fundamental right. If a protected class or fundamental right is involved, this Court must apply strict scrutiny, but where no suspect class or fundamental right is implicated, this Court must apply rational basis review. Under rational basis review, the governmental policy at issue … must be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate government purpose. Under rational basis review, a plaintiff faces a severe burden and must negate all possible rational justifications for the distinction.

*Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir.2005) (internal quotation marks omitted).

■■■ Plaintiffs admit that their claims are subject to rational basis review, but claim in a conclusory fashion that TVAAS is "arbitrary and unsupported by any rational basis." (Doc. 56 at 16). Specifically, Plaintiffs claim that both the statistical shortcomings of TVAAS as well as the six

tested students threshold for receiving an individualized TVAAS score are arbitrary. The Court will address each claim in turn.

Plaintiffs take umbrage with the State's reliance on less than statistically significant results in assigning TVAAS scores. First, Plaintiffs claim that "[a] test statistic of Minus One (-1), which places a teacher at TVAAS Level 2, allows one to say at most that there is a 68% confidence level,—substantially less than a 'statistically significant' level—that the teacher is not performing at the mean or State growth standard. (*Id.* at 10). Inherent in this argument is that Plaintiffs contend that in order to not be deemed an arbitrary violation of the Due Process Clause, the state must rely only on statistically significant results.[11] Plaintiffs, however, cite no authority for this proposition, and the Court has found none.

Applying the rational basis test, the Court finds nothing impermissible about the State's reliance on TVAAS scores based on confidence levels. As laid out in detail above, TVAAS scores are assigned as follows:

5 — "Most Effective." Test statistic = +2 = 95% confidence that a teacher's students performed at above-average student growth.

4 — "Above Average." Test statistic = +1 = 68% confidence that a teacher's students performed at above-average student growth.

3 — "Average Effectiveness."

2 — "Approaching Average Effectiveness." Test statistic = –1 = 68% confidence that a teacher's students performed at below-average student growth.

1 — "Least Effective." Test statistic = –2 = 95% confidence that a teacher's

---

11. Even if statistical significance were the standard, which this Court expressly declines to hold, Plaintiffs' claims would fail because each Plaintiff received a TVAAS score of 1. By

Plaintiffs' own admission, this score indicates at a statistically significant level that Plaintiffs' students performed at below-average student growth.

students performed at below-average student growth.

An obvious purpose of using value-added measurements in teacher evaluations is to identify and support instruction that will lead to high levels of student achievement. (Doc. 58 at 5). It is uncontested that this is a legitimate government purpose. Plaintiffs' claim, therefore, is that the TVAAS scores based on such low confidence intervals is not rationally related to that purpose. As indicated by the score ranges above, in assigning a teacher a TVAAS score indicating above or below average effectiveness, the State is, at minimum, 68% confident that the teacher either positively or negatively attributed to student growth. Simply stated, it is not irrational for the State to rely on a 68% confidence level. Indeed, were this case to go to trial, its merits would be subject to a preponderance of the evidence standard. That is, the Court could make its decisions based on a 51% confidence level. Surely then, a 68% confidence level must pass rational basis review, the most lenient form of judicial scrutiny under the Due Process Clause.

Plaintiffs next claim that "[b]ecause relatively large standard errors accompany individual teacher TVAAS estimates, it is not uncommon for a statistically significant 95% confidence interval to span three or more TVAAS 'Levels.'" (Doc. 56 at 11, 11 n.7). This argument suffers from two infirmities. First, Plaintiffs again fail to cite any authority directing this Court to apply statistically significant confidence intervals to analyze the use of a statistical system under rational basis review. Second, Plaintiffs' argument presents the other side of the same coin of its confidence level argument. An example is illustrative. If a teacher were to receive a TVAAS score of 2, the State has concluded with 68%

confidence that the teacher's students' growth was less than average student growth. Ergo, there is a 32% chance that the teachers' students actually grew at or above average student growth. Plaintiffs' "new" argument that a "statistically significant 95% confidence interval [may] span three or more TVAAS 'Levels,'" therefore, is a tautology, as there is a 32% chance that the teacher should have received a TVAAS score of 3 or better. This argument does nothing to diminish the fact that the TVAAS model has shown with 68% certainty that, where the teacher receives a TVAAS score of 2, the teacher's students grew less than expected. As stated above, a 68% confidence level in teacher effect on student growth is rationally related to identifying and supporting instruction that will lead to high levels of student achievement.

Plaintiffs also claim that TVAAS scores do not measure relative effectiveness of teachers because they are merely "test statistics" that "only test[ ] the truth or falsity of the null hypothesis at varying confidence levels." (Doc. 56 at 21). While it is true that a teacher receiving a score of 4 may have contributed to more student growth than a teacher receiving a score of 5, this fact does not make the State's classification irrational. As explained in detail above, when a teacher receives a score of 5, the State has a 95% confidence level that he/she contributed to student growth. When a teacher receives a score of 4, the State has a 68% confidence level that he/she contributed to student growth. The Court cannot conclude, as Plaintiffs request, that it is irrational for the State to assign a higher score to a teacher where the State is more confident that he/she contributed to student growth.

Plaintiffs' final grievance with the statistical methods of TVAAS [12] is that "they are

---

12. Plaintiffs also allege that it is irrational for the State to re-estimate TVAAS scores in light

based on data—TCAP results—that have not been validated for use in measuring the teacher 'effect' that TVAAS purports to measure." (Doc. 56 at 22). Because TCAP assessments have not been validated for use in measuring teacher effectiveness, Plaintiffs argue, it is irrational to use them as an input in the TVAAS system. As identified by Defendants, however, this argument is a red herring. Defendants claim, and Plaintiffs do not dispute, that "TVAAS algorithms have been validated for their accuracy in measuring a teacher's effect on student growth." (Doc. 50 at 25–26). TCAP scores need not be validated for measuring teacher effectiveness merely because they are used as an input in a validated statistical model that measures teacher effectiveness. Plaintiff's claim that "[i]n educational settings, when a test is designed or used to serve multiple purposes, evidence of validity, reliability/precision, and fairness should be provided for each intended use," (Doc. 56 at 22), would certainly be applicable if TCAP scores were the only metric used to calculate a TVAAS score. That, however, is not the case, as TCAP scores are merely one input of many in the complex TVAAS algorithm.

Reaching beyond specific statistical complaints, Plaintiffs also claim that it is arbitrary and irrational that a teacher with six or more tested students receives an individualized TVAAS score, while all other teachers receive system-wide scores. The Tennessee legislature, however, could reasonably conclude that, based on the same statistical arguments presented by Plaintiffs, an evaluation based on too small a sample of students could result in unreliable TVAAS scores.[13] While drawing the

line at six students may seem arbitrary to Plaintiffs, beliefs "based on rational speculation unsupported by evidence or empirical data" are not properly struck down on rational basis review. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

Finally, Plaintiff Taylor alleges that in assigning him an individualized TVAAS score based on only a subset of his students (22 out of 142), Defendants acted arbitrarily in violation of the Due Process Clause. This argument, too, fails under rational basis scrutiny, for the reasons set forth in greater detail in the following section.

The Court notes that Plaintiffs' criticisms of the statistical methods of TVAAS are not unfounded. Rational basis review, however, dictates not that this Court assess whether the policy at issue is imprudent, but whether it is rationally related to a legitimate government interest. *See, e.g., id.* at 314, 113 S.Ct. 2096 ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted *no matter how unwisely we may think a political branch has acted.*") (emphasis added). Plaintiffs bemoan the statistical imprecision of TVAAS, but have cited no authority, and the Court has found none, supporting the proposition that the United States Constitution requires legislative decision making regarding the use of statistics to require "statistically significant" results. Absent controlling authority to the contrary, this Court refuses to extend the rational basis test this far–where no sus-

---

of new student testing data. Plaintiffs, however, have failed to allege how this has caused them harm. At any rate, it is entirely rational for the State to update TVAAS scores based on new data as it is collected, rather than to rely on outdated data.

13. Plaintiffs admit as much in their briefing, stating that "TVAAS estimates based on smaller numbers of students, as few as six, *are even more imprecise and unreliable.*" (Doc. 56 at 21 n.16) (emphasis added).

pect class or fundamental right is at issue, the Constitution requires a rational basis, not a statistically significant basis, for the law in question.

Even accepting as true Plaintiffs arguments regarding TVAAS' statistical deficiencies, the Court finds that Plaintiffs fail to state a claim because neither the Fourteenth Amendment nor any cases interpreting it require statistical significance to pass the rational basis test. While it may be a blunt tool, a rational policymaker could conclude that TVAAS is "capable of measuring some marginal impact that teachers can have on their own students." *Cook v. Bennett,* 792 F.3d 1294, 1302 (11th Cir.2015). This is all the Constitution requires.

Accordingly, and independently of Plaintiffs' failure to plead a deprivation of a property interest sufficient to trigger the protections of the substantive Due Process Clause, Defendants' Motions to Dismiss Plaintiffs' Substantive Due Process claims will be **GRANTED**.

## C. Equal Protection

Plaintiffs next argue that certain aspects of TVAAS violate the Equal Protection Clause of the Fourteenth Amendment, both as-applied and facially. Specifically, Plaintiffs argue that there is no rational basis for the State to assign an individualized TVAAS score to a teacher who taught six or more tested students, but to assign a system-wide score to a teacher who taught fewer than six tested students. For the reasons stated in the preceding section, this claim fails under rational basis scrutiny.[14] Plaintiffs next claim that "[t]here is no rational basis for treating the number of six students as an adequate basis for determining the overall effectiveness of a teacher with tested students, regardless of the total number of non-tested students that the teacher may also instruct." (Doc. 56 at 18). This argument is highlighted by Plaintiff Taylor's personal circumstances, namely that his 2011–12 TVAAS score was based on the test scores of only 22 of his 142 students. Furthermore, Plaintiff Taylor alleges an Equal Protection violation for the 2012–13 school year because, while all of his students were administered the TCAP test, his advanced Physical Science students were instructed with a curriculum not aligned to the TCAP test. Basing his TVAAS score in part on these unprepared students' assessments, Plaintiff Taylor argues, is irrational.[15] The Court will ad-

---

**14.** Because rational basis review is substantially similar under the Due Process Clause and the Equal Protection Clause, the Court finds it unnecessary to reiterate the rational basis for the six tested student classification.

**15.** At the outset of their equal protection arguments, Plaintiffs rely on *St. Louis Teachers Union Local 420 v. Board of Educ. of City of St. Louis,* 652 F.Supp. 425, 435–36 (E.D.Mo. 1987), for the proposition that evaluating teachers' performance on the basis of students' standardized test scores is arbitrary and irrational. (Doc. 56 at 17). Aside from not being binding on this Court, the *St. Louis Teachers Union* case is easily distinguishable from the present case. First, as Defendants note, the teacher evaluation system in *St. Louis Teachers Union* relied *entirely* on student test scores. That is not the case here, as

TVAAS is a much more sophisticated statistical system and only comprises 35% of a teacher's evaluation. Second, and more importantly, the *St. Louis Teachers Union* court did not hold that evaluating teachers' performance on the basis of student test scores was arbitrary and irrational. The court merely stated that "Plaintiffs allege that, and Dr. Berk's affidavits attached to plaintiffs' first amended and original complaints strenuously assert that, defendants acted arbitrarily, capriciously, and irrationally by evaluating teachers ... on the basis of their students' CAT scores. Therefore, *plaintiffs state a claim* for a deprivation of their substantive due process rights." 652 F.Supp. at 435–36 (emphasis added). Accordingly, Plaintiffs mischaracterize the case in arguing that the court commented on the merits of plaintiffs' claims. Furthermore, the Court notes that

dress these arguments in turn, starting with Plaintiffs' as-applied challenges.

■ First, Plaintiff Taylor complains that it was irrational to base his individualized TVAAS score on the TCAP scores of just 22 of his 142 students during the 2011–12 school year. Plaintiffs maintain that

> [e]ven Dr. Sanders, the developer of TVAAS, stated quite clearly that a TVAAS result based on testing by a small portion of the Plaintiff Taylor's students may be a valid measure of Taylor's effectiveness as a teacher with those students, but it is not a valid measure of his overall effectiveness as a teacher with all of his non-tested students.

(Doc. 56 at 18). Furthermore, Plaintiff Taylor believes he was disadvantaged because his Physical Science students, the most advanced students Plaintiff Taylor taught, were not given the TCAP test. Even accepting these allegations as true, Plaintiffs' claims do not survive rational basis scrutiny. First, it makes no difference whether Plaintiff Taylor's most advanced or least advanced students were tested, as TVAAS measures student *growth* (based on previous student test scores), not gross TCAP results. Second, it is not irrational for the State to base a performance evaluation on a subset of a teachers' work. In fact, a full 50% of a teachers' evaluation is based on classroom observation. This portion, absent obviously impractical round-the-clock observation, is necessarily a subset of a teacher's performance, yet Plaintiffs do not, and cannot claim that this is irrational. Finally, it is rational for the State to only test students in subjects for which appropriate statewide tests have been created. During the 2011–12 school year, the State had developed a general science TCAP assessment, but not an assessment for Physical Science. Because the United States Constitution permits the Tennessee legislature to "approach a perceived problem incrementally," *Beach Commc'ns, Inc.*, 508 U.S. at 316, 113 S.Ct. 2096, the testing of only a subset of Plaintiff Taylor's students does not amount to an Equal Protection violation.

■ Plaintiff Taylor also claims that in the 2012–13 school year, it was irrational to subject his Physical Science students to the TCAP assessment because their curriculum was not aligned with the assessment. This claim, too, fails as a matter of law under rational basis review. The Tennessee legislature, for example, could have reasonably believed that Plaintiff Taylor's Physical Science students, notwithstanding their advanced course of study, should still be knowledgeable about general science concepts. As acknowledged in a case interpreting the same statistical system, "[t]he Constitution does not preclude policymakers from creating these incentives or from encouraging teachers to teach to the test." *Wagner*, 112 F.Supp.3d 693–95 (M.D.Tenn.2015).

Because the State's decision to test a subset of Plaintiffs' students is rationally related to the legitimate government purpose of identifying and supporting instruction that will lead to high levels of student achievement, Plaintiffs' conclusory allegations of violations of the Equal Protection Clause fail to state a claim upon which relief can be granted. Furthermore, because Plaintiffs' as-applied challenges fail as a matter of law, the Court will not address the Parties' arguments regarding

---

this decision is of little value because it was decided before the Supreme Court of the United States heightened the pleading requirements in *Twombly* and *Iqbal*. Under today's standard, it is far from certain that the plaintiffs' claims in *St. Louis Teacher's Union* would withstand a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6).

Plaintiffs' facial challenge and the standard set forth in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), as those claims also must fail as a matter of law. Accordingly, with respect to Plaintiffs' Equal Protection Clause claims, Defendants' Motions to Dismiss will be **GRANTED.**

### D. Procedural Due Process

Plaintiffs also claim that the Act and Policy 5.201 contain such insufficient appellate procedures regarding their performance evaluations that they violate the procedural component of the Due Process Clause of the Fourteenth Amendment. Specifically, they claim that the Act and Policy do not afford meaningful review of TVAAS results and high-stakes employment decisions because "the data used for a teacher's TVAAS result is TCAP testing data, and that data is not available to the teacher." (Doc. 56 at 26).

██ As with substantive Due Process claims, in order to be entitled to procedural Due Process protections, Plaintiffs must have a property interest at stake. "Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). There are two property interests at stake in this litigation: Plaintiffs' property interest in their evaluations, and Plaintiffs' property interest in APEX bonuses. Notwithstanding Plaintiffs' protestation that the two are "inextricably intertwined," the nature of these interests and the differing status of the Defendants require that they be discussed separately.

██ First, and conclusively for the State Defendants, an employee performance evaluation is not a sufficient property interest to invoke procedural due process protections. *See Spittal v. Piperni,* 1986 WL 16531 at *3, 786 F.2d 1166 (6th Cir.1986). Furthermore, Plaintiffs' claims against the State Defendants for denial of due process in the evaluation procedure are misguided. Policy 5.201 specifically states that the purpose of the procedures for challenging TVAAS scores is "[t]o efficiently and fairly resolve grievances regarding procedural errors in the evaluation process, *not to address disputes regarding employment actions taken based on the results of an evaluation. More significant due process rights are provided pursuant to state law to teachers when actual employment actions are taken.*" (Doc. 41–1 at 8) (emphasis added). Because the State Defendants did not deny bonuses to Plaintiffs, and because Plaintiffs have no protected property interest in their evaluations, Plaintiffs claims of violations of procedural Due Process against the State Defendants fail as a matter of law. Accordingly, the State Defendants' Motion to Dismiss Plaintiffs' procedural Due Process claims will be **GRANTED.**

██ Next, Plaintiffs allege that Defendant KCBE denied them procedural Due Process in the denial of their APEX bonuses. Defendant KCBE claims that Plaintiffs do not have a protected property interest because "[c]ourts have long recognized that *de minimus* property interests do not trigger procedural due process protections." (Doc. 52 at 4) (citing, *inter alia, Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). Defendant KCBE thus argues that Plaintiffs' property interest in a $1,500 bonus does not implicate the Due Process Clause. While some may consider specious the argument that a $1,500 bonus is a *de minimus* property interest to "a largely underpaid group of professionals who often survive from paycheck to paycheck," (Doc. 56 at 15 n.13),

the Court need not reach this issue. As discussed above,

> an interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can and should be redressed by a state breach of contract action and not by a federal action under section 1983.

*Ramsey*, 844 F.2d at 1274–75. Here, as in *Ramsey*, Plaintiffs allege a deprivation of "a property interest in a specific benefit . . . of employment," which is "defined easily . . . and therefore, any interference with that interest is redressed adequately in a state breach of contract action." *Id.* at 1274. As the *Ramsey* court acknowledged "it is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim." *Id.* at 1273. Indeed, Plaintiff Trout has petitioned this Court to address the denial of her APEX bonus in a separate count for breach of contract. Because Plaintiffs' property interest in APEX bonuses are adequately protected by state breach of contract actions, Plaintiffs' 42 U.S.C. § 1983 cause of action for violations of procedural Due Process fail as a matter of law.[16] Accordingly, Defendant KCBE's Motion to Dismiss Plaintiffs' procedural Due Process claims will be **GRANTED.**

### E. State Law Claims

■ Finally, Plaintiffs bring causes of action for breach of contract and for violations of the Tennessee Constitution. The Court has now determined that all of Plaintiff's federal claims should be dismissed with prejudice. When a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims. 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Novak v. MetroHealth Med. Ctr.,* 503 F.3d 572, 583 (6th Cir.2007). Because all federal claims have been dismissed and the parties are non-diverse, the basis for the Court's original jurisdiction is extinguished. The Court thus declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Accordingly, Plaintiffs' state law claims will be **DISMISSED WITHOUT PREJUDICE.**

## IV. CONCLUSION

It bears repeating that Plaintiffs' concerns about the statistical imprecision of TVAAS are not unfounded. In addressing Plaintiffs' constitutional claims, however, this Court's role is extremely limited. The judiciary is not empowered to second-guess the wisdom of the Tennessee legislature's approach to solving the problems facing public education, but rather must determine whether the policy at issue is rationally related to a legitimate government interest. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 55, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). While the Court expresses no opinion as to whether the Tennessee legislature has enacted sound public policy, it finds that the use of TVAAS as a means to measure teacher efficacy survives minimal constitutional scrutiny. If this policy proves to be unworkable in practice, Plaintiffs are not to be vindicated by judicial intervention, but rather by the democratic process.

For the reasons stated herein, Defendants' Motions to Dismiss (Docs. 49, 51)

---

**16.** Since the Court will dismiss Plaintiffs state law claims without prejudice, Plaintiffs are free to bring these claims in a subsequent state court action.

are hereby **GRANTED**. Accordingly, Plaintiffs' federal claims are hereby **DISMISSED WITH PREJUDICE**, and Plaintiffs' state law claims are hereby **DISMISSED WITHOUT PREJUDICE**.

A separate judgment will enter.

**SO ORDERED** this 17th day of February, 2016.